AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 21MJ8554 |
| Facebook, Inc. | ) | |
| 1601 Willow Road, Menlo Park, CA 94025 | ) | |
| Host of account: gene.castillo.58323 | ) | |

**FILED**

6/29/2021

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY      vyc                      DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ____Northern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21, USC sec. 952, 960, 963 | Importation of a Controlled Substance, and Conspiracy to commit the same |

The application is based on these facts:

See Attached Affidavit of Homeland Security Investigations Special Agent Abby Kratzke, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Abby Kratzke*

*Applicant's  signature*

Special Agent Abby Kratzke, HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: ____06/25/2021____

*Ruth Bermudez Montenegro*

*Judge's signature*

City and state:  El Centro, California          Hon. Ruth Bermudez Montenegro, U.S. Magistrate Judge

*Printed name and title*

## **ATTACHMENT A**

### **PROPERTY TO BE SEARCHED**

Facebook, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1601 Willow Road, Menlo Park, CA 94025. This warrant applies to information associated with the Facebook user ID gene.castillo.58323 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

I.      **Service of Warrant**

The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II.     **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     Contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     Activity logs for the account and all other documents showing the user's posts and other Facebook activities **November 04, 2020 through December 05, 2020**;

(c)     Photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **November 04, 2020 through December 05, 2020**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     Profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     Records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     Other records and contents of communications and messages made or received by the user from **November 04, 2020 through December 05, 2020** including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     "Check ins" and other location information;

(h)     IP logs, including all records of the IP addresses that logged into the account;

(i)     Records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     Information about the Facebook pages that the account is or was a "fan" of;

(k)     Past and present lists of friends created by the account;

(l)     Records of Facebook searches performed by the account from **November 04, 2020 through December 05, 2020**;

(m)     Information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     Privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within **7 days** of issuance of this warrant.

## III.     Search of the Data

The search of the data supplied by the ISP pursuant to this warrant will be conducted by United States Homeland Security Investigations as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of November 04, 2020 through December 05, 2020 and to the seizure of:

a.      Communications, photographs, locations, postings, records, contacts, biographical information, and attachments tending to discuss or establish violations of Title 21, Sections 952, 960, and 963;

b.      Communications, photographs, locations, postings, records, contacts, biographical information, and attachments tending to identify Rosa Carmona and any co-conspirators involved in the activities in III(a) above; and

c.      Communications, photographs, locations, postings, records, contacts, biographical information, and attachments that provide context to any communications described above , such as electronic communications sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of 21 U.S.C. §§ 952, 960, and 963.**

**AFFIDAVIT**

I, Special Agent Abby Kratzke, being duly sworn, hereby state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.   The information to be searched is described in the following paragraphs and in Attachment A.   This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with Facebook user ID **gene.castillo.58323** from November 04, 2020 through December 05, 2020, for items that constitute evidence of violations of federal criminal law, name, Title 21, United States Code, Sections 952, 960 and 963, as described in Attachment B.

2.     I have been employed as a Special Agent with Homeland Security Investigations (HSI) since March 2019. I am currently assigned to the HSI Office of the Assistant Special Agent in Charge, in Calexico, California. My job duties are to investigate the smuggling of controlled substances into the U.S.  I have been cross-designated by the U.S. Drug Enforcement Administration (DEA) to conduct narcotics investigations and enforce provisions of the Federal Controlled Substances Act, pursuant to Title 21 of the United States Code.  Prior to employment with HSI, I was employed with United States Customs and Border Protection (CBP), from December 2016 until February 2019 as an Officer. As an HSI Special Agent, my formal training consisted of six months of residential instruction at the Federal Law Enforcement Training Center in Glynco, Georgia, which included training related to narcotics and dangerous drugs.  I also learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime scene, and the use of electronic evidence.  I have participated in training programs related to controlled substances, including but not limited to marijuana,

cocaine, methamphetamine, and heroin.  I have also received training in the methods used by narcotics traffickers to import, distribute, package and conceal controlled substances.  I have participated in several narcotics investigations and executed arrests for drug-related offenses, including transportation and the importation of controlled substances. Additionally, through the course of my duties as a Special Agent, I have discussed narcotics smuggling and trafficking with other experienced narcotics investigators and received informal training regarding illegal drug trends and methods of operation for multi-kilogram drug smuggling, trafficking, and dealing in the San Diego area.

3.     During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California.  Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry. During the course of my duties I have (1) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs crossing the border from Mexico into the United States, and while operating inside the United States; (2) executed or participated in numerous arrests for drug-related offenses, including possession with the intent to distribute; and (3) interviewed criminal defendants and witnesses in furtherance of investigations into the illegal smuggling and trafficking of controlled substances.

4.     I am aware that it is common practice for narcotics traffickers to work in concert utilizing third-party communications applications installed on cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles that enter the United States at Ports of Entry such as the Calexico Port of Entry.  With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individuals in the vehicle whom are responsible

for driving the vehicle containing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with these individuals regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the passengers to remotely monitor the progress of the narcotics, provide instructions to the passengers and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the passengers to provide further instructions regarding the transportation of the narcotics to a destination within the United States.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 952, 960 and 963 have been committed by Gene CASTILLO. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## FACTS SUPPORTING PROBABLE CAUSE

7.     On December 4, 2020, at approximately 8:20 p.m., defendant Gene Anthony CASTILLO ("CASTILLO") applied for permission to enter the United States at the Calexico Port of Entry. CASTILLO was a passenger in a 2015 Acura bearing California license plates. CASTILLO was in the vehicle with James HOFMANN and Julianna CUEVAS. CASTILLO was referred for secondary inspection. In vehicle secondary, a CBPO scanned the vehicle and noticed anomalies in the trunk and gas tank area of the vehicle. A Canine Enforcement Officer (CEO) utilized their human narcotic detection dog (HNDD) to conduct a search of the vehicle. The CEO observed the

3

HNDD alert to the presence of a trained odor near the gas tank of the vehicle. A secondary CBPO conducted a search of the vehicle and discovered 20 packages concealed within the underbody, and heat shield of the vehicle. The packages revealed a white crystal-like substance that field-tested positive for the presence of methamphetamine. The total combined weight was approximately 4.14 kilograms (9.12 pounds) of methamphetamine. CASTILLO was subsequently arrested, and a cell phone was seized from CASTILLO.

7.     On June 3, 2021, I served a subpoena to the El Centro Detention Facility to review the phone calls CASTILLO has made and received from jail.

8.     Upon reviewing the recordings provided by the El Centro Detention Facility, I reviewed audio from a telephone call on May 14, 2021 at 20:43:37 hours CASTILLO had a phone call with an unidentified male (UM) with the phone number 951-442-1514. After discussing CASTILLO's understanding of the evidence in the case, the following exchange took place:

CASTILLO: "Doesn't it look like, fucking—doesn't she [co-defendant CUEVAS] make it look like them two asked them to do this whole thing behind my back or something. What the fuck it's her uncle's car? I can't believe they fucking got her to say that, fool."

UM: "That's fucking crazy, bro. Come on, bro."

CASTILLO: "Yeah. Yeah. The other thing, too, if – On my messenger on Facebook, right?"

UM: "Yeah."

CASTILLO: "Fucking delete all my messages. Don't log off – don't log off my messages."

UM: "Yeah."

CASTILLO: "But stay logged on and just delete all those messages.  Delete everybody, you hear me?"

UM: "I hear you, yeah. I was going to do that, but I was going to ask you.  Good

thing you brought it up."

CASTILLO: "Yeah, but make sure you stay logged on for – you know what I mean?"

UM: "Yeah."

9.      I obtained a search warrant for CASTILLO's cell phone on January, 11, 2021. A certified forensic analyst attempted to obtain data from the phone but was unsuccessful. As a result, to date, federal investigators have been unable to review the contents of the above-referenced Facebook Messenger communications.

10.      Investigators now seek the instant search warrant for CASTILLO's Facebook account in order to capture the full content of the above-referenced Facebook Messenger communications. Per the investigators' search for CASTILLO's Facebook account, CASTILLO's Facebook user ID appears to be gene.castillo.58323.   The name in the account matches CASTILLO's first and last name, and the picture associated with the account appears to be the Defendant, whom I personally encountered and interviewed after his arrest.   Pursuant to open source research, the Facebook account associated with that user ID remains active. Additionally, I have learned from consultation with law enforcement personnel that user data retained by Facebook and furnished in response to legal process can contain messages deleted by the user. Such deleted messages will include a note in such contents provided by Facebook as "Deleted True." Undeleted messages included in such contents provided by Facebook will include the note "Deleted False." A 90-day preservation letter was submitted to Facebook on June 17, 2021 for Facebook user ID gene.castillo.58323.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

11.      The United States has attempted to obtain this data by other means. The prior attempts were not successful as set forth in paragraphs 9–10, above.

## FACEBOOK

22.      Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written

news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

23.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.   This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.   Facebook also assigns a user identification number to each account.

24.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.   Facebook assigns a group identification number to each group.   A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."   If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.   Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.   By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.   A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.   Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

26.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.   Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items

available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27.   Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

28.   Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

29.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can

also become "fans" of particular Facebook pages.

31.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

34.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

36.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from

other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

37.   As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's

motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

38.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

39.     Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that the records and contents of electronic communications are stored within the target Facebook account.  In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the target Facebook account to communicate with others to further the importation of illicit narcotics into the United States.  Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the target Facebook account for data beginning on November 4, 2020, up to and including December 05, 2020.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

40.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in

Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

41.   Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook.  The impact on Facebook's business would be disruptive and severe.

42.   Therefore, I request authority to seize all content, including electronic communications and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Facebook account, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the privacy of Facebook subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, United States Homeland Security Investigations seeks authorization to allow Facebook to make a digital copy of the entire contents of the account subject to seizure.  That copy will be provided to me or to any authorized federal agent.   The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B.  Relevant electronic records will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

43.   Analyzing the data to be provided by Facebook may require special technical skills, equipment, and software.  It may also be very time-consuming.  Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword

searches do not capture misspelled words, reveal the use of coded language, or account for slang.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text.  Many common electronic communications, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text.  Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

44.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.   Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

45.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

46.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**CONCLUSION**

47.     Based on the foregoing, I request that the Court issue the proposed search warrant.

48.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

49.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States for the Southern District of California that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

I swear the foregoing is true and correct to the best of my knowledge and belief.


_Abby Kratzke_
_____
Special Agent Abby Kratzke
Homeland Security Investigations


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  25   day of June, 2021.


_Ruth Bermudez Montenegro_
_____
Honorable Ruth Bermudez Montenegro
United States Magistrate Judge

13

## <u>ATTACHMENT A</u>

## PROPERTY TO BE SEARCHED

Facebook, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1601 Willow Road, Menlo Park, CA 94025. This warrant applies to information associated with the Facebook user ID gene.castillo.58323 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### PARTICULAR THINGS TO BE SEIZED

**I.      Service of Warrant**

The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    Contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    Activity logs for the account and all other documents showing the user's posts and other Facebook activities **November 04, 2020 through December 05, 2020**;

(c)    Photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **November 04, 2020 through December 05, 2020**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     Profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     Records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     Other records and contents of communications and messages made or received by the user from **November 04, 2020 through December 05, 2020** including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     "Check ins" and other location information;

(h)     IP logs, including all records of the IP addresses that logged into the account;

(i)     Records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     Information about the Facebook pages that the account is or was a "fan" of;

(k)     Past and present lists of friends created by the account;

(l)     Records of Facebook searches performed by the account from **November 04, 2020 through December 05, 2020**;

(m)     Information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     Privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within **7 days** of issuance of this warrant.

## III.    Search of the Data

The search of the data supplied by the ISP pursuant to this warrant will be conducted by United States Homeland Security Investigations as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of November 04, 2020 through December 05, 2020 and to the seizure of:

a.      Communications, photographs, locations, postings, records, contacts, biographical information, and attachments  tending to discuss or establish violations of Title 21, Sections 952, 960, and 963;

b.      Communications, photographs, locations, postings, records, contacts, biographical information, and attachments tending to identify Rosa Carmona and any co-conspirators involved in the activities in III(a) above; and

c.     Communications, photographs, locations, postings, records, contacts, biographical information, and attachments that provide context to any communications described above , such as electronic communications sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of 21 U.S.C. §§ 952, 960, and 963.**